1

2                    **UNITED STATES DISTRICT COURT**

3                       **DISTRICT OF OREGON**

4                       **PORTLAND DIVISION**

5

6    TOMMIE L. VANDERPOOL,              )
                                        )
7                    Plaintiff,         )    No. 03:10-cv-06264-HU
                                        )
8    vs.                                )
                                        )
9    MICHAEL J. ASTRUE,                 )    **FINDINGS AND RECOMMENDATION**
     Commissioner of Social Security,   )
10                                      )
                     Defendant.         )
11
                     _____
12

13

14   Mark A. Manning
     Kathryn Tassinari
15   Harder, Wells, Baron & Manning, P.C.
     474 Willamette Street, Suite 200
16   Eugene, OR 97401

17       Attorneys for Plaintiff

18

19   S. Amanda Marshall
     United States Attorney
20   Adrian L. Brown
     Assistant United States Attorney
21   1000 S.W. Third Avenue, Suite 600
     Portland, OR 97204-2904
22

23   David Morado
     Regional Chief Counsel, Region X, Seattle
24   J. Ricardo Hernandez
     Special Assistant United States Attorney
25   Social Security Administration
     Office of the General Counsel
26   1301 Young Street, Suite A-702
     Dallas, TX 75202
27

28       Attorneys for Defendant


1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Tommie L. Vanderpool (also known as Tommy Lee Vanderpool and Thomas Lee Vanderpool) seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying his applications for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act. Vanderpool argues the Administrative Law Judge ("ALJ") erred in failing to address the opinions of two treating psychiatrists, and one examining physician; failing to give clear and convincing reasons for rejecting Vanderpool's testimony; failing to address third-party lay witness testimony; and finding Vanderpool can perform "other work" in the national economy. *See* Dkt. ## 16 & 19.

## I. PROCEDURAL BACKGROUND

Vanderpool protectively filed his applications for SSI and DI benefits on January 22, 2008, at age 43, claiming disability since December 18, 2007, due to arthritis in his feet, back, hip, and hands; a "major depression disorder" and other "mental disorders"; hypertension; and arteriosclerosis. (A.R. 125; 100-12[1]) Vanderpool's applications were denied initially and on reconsideration.

_____

[1]The administrative record was filed electronically using the court's CM/ECF system. Dkt. #13 and attachments. Pages of the record contain three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #13-10, Page 16 of 129); a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency. Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

(A.R. 42-45)  He requested a hearing, and a hearing was held on January 7, 2010, before an ALJ. Vanderpool testified on his own behalf, and a Vocational Expert ("VE") also testified.  (A.R. 27-41)  On January 26, 2010, the ALJ issued his decision, denying Vanderpool's applications for benefits.  (A.R. 9-21)  Vanderpool appealed the ALJ's decision, and on July 27, 2010, the Appeals Council denied his request for review (A.R. 1-4), making the ALJ's decision the final decision of the Commissioner.   20 C.F.R. §§ 404.981, 416.1481.  Vanderpool filed a timely Complaint in this court seeking judicial review of the Commissioner's final decision denying his applications for benefits.  Dkt. #2.  The matter is fully briefed, and the undersigned submits the following findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.   FACTUAL BACKGROUND

### A.   Summary of the Medical Evidence

The record contains medical evidence as far back as 1998. Because Vanderpool claims a disability onset date of December 18, 2007, the court will discuss his earlier medical history only briefly.

On November 15, 2001, Vanderpool saw a physical therapist for a complaint of lower back pain with left-sided sciatica.  (A.R. 239)

In August 2002, Vanderpool requested temporary light duty due to right foot pain.  A doctor (signature illegible) completed a work restriction form imposing work limitations, and estimating it

3 - FINDINGS & RECOMMENDATION

would be one month before Vanderpool could return to unrestricted duty. (A.R. 252)

On May 4, 2003, Vanderpool fractured his right foot. He was treated with a cast and "cam walker," and pain medications. He was cleared to return to work on May 56, 2003, on light duty with lifting restrictions. (A.R. 232-33)

On May 21, 2003, podiatrist Loris Yadegarian completed a medical certification form for the Post Office, where Vanderpool worked. Dr. Yadegarian indicated Vanderpool has a structural deformity of his feet that causes problems as a result of his attempt to compensate for the deformity. The doctor indicated Vanderpool should "never be allowed to perform" certain types of activities because of his foot deformity. (A.R. 197; *see* A.R. 191)

On August 29, 2003, Vanderpool saw podiatrist Timothy J. Sill in connection with a right foot fracture. Vanderpool was placed on a work restriction of "No weight bearing or if necessary limited bearing right foot." (A.R. 238) On September 1, 2003, Dr. Sill diagnosed Vanderpool with a "nonhealing fracture" of his right foot. Vanderpool was treated with a fiberglass cast, with no weight bearing. He was given a release from all work, with a likely duration of three months. Dr. Sill opined Vanderpool might need surgery on his foot. (A.R. 244-46)

On November 19, 2003, Dr. Sill completed a work restriction form for the Post Office on which he opined Vanderpool could lift, carry, sit, stand, push, and pull intermittently, for a total of two to three hours, each, during the work day. He gave Vanderpool no other restrictions. (A.R. 208) He indicated the reason for the restrictions was a "malunion [right] foot fracture," that was being

4 - FINDINGS & RECOMMENDATION

treated with a cast and had a good prognosis.  He opined Vanderpool could return to work on December 1, 2003.  (A.R. 209)  On January 7, 2004, Dr. Sill provided an updated work restriction form indicating Vanderpool was released for full duty with no restrictions.  (A.R. 243)

Vanderpool saw Dr. Sill on January 26, 2004, and the doctor completed a work restriction form indicating Vanderpool should not be exposed to cold weather during the winter months of "Nov thru March."  (A.R. 250)  He indicated Vanderpool could stand and walk for two to three hours continuously, with a total of eight hours a day; and he could sit for a total of an hour-and-a-half a day.  (*Id.*)  Dr. Sill completed a work release form on March 8, 2004, indicating Vanderpool could return to full duty at work as of March 31, 2004.  (A.R. 220)

On April 19, 2005, Vanderpool saw psychiatrist S.A. Manohara, M.D., who completed a work restriction form indicating Vanderpool was taking "medication that might cause drowsiness," and he should not operate machinery for an estimated period of six months.  (A.R. 264)

On June 30, 2005, a nurse at a hospital in Junction City, Oregon, wrote a note for Vanderpool indicating he had "been at his father's bedside since 6-26-05 when his father was emergently admitted" to the hospital and remained on life support in the I.C.U.  (A.R. 248)

On October 18, 2005, Dr. Manohara wrote a work release note for Vanderpool indicating he was "unable to work on dangerous machinery for next 90 days."  (A.R. 268)

5 - FINDINGS & RECOMMENDATION

On June 19, 2006, Vanderpool requested "Family sick leave" for twelve weeks, stating "Mentle [sic] Health is not good, server [sic] depression, anxiety." (A.R. 266) In support of his request, Vanderpool submitted a form containing an illegible signature purporting to be that of a medical doctor from Junction City, Oregon. Information on the form indicated Vanderpool had "perma-nent/chronic" conditions consisting of "hypertension, severe depression, [and] anxiety disorder." (A.R. 265)

On July 7, 2006, Vanderpool submitted another form, purpor-tedly by the same doctor from Junction City, Oregon, indicating Vanderpool suffered from schizophrenia, "split personality," and "mentle [sic] disorder." (A.R. 404) The form further notes Vanderpool's condition commenced approximately June 7, 2006; the probable duration was "12 wks or more"; and Vanderpool was unable "to perform any of his job functions." (*Id.*; A.R. 406)

On July 21, 2006, a memorandum was circulated between supervisory staff at the Post Office questioning whether the June 19 and July 7 doctors' certifications might be forgeries. (A.R. 411) The writers noted the misspelling of "mentle" on both forms, and the fact that the handwriting appeared to be the same as Vanderpool's. They called the doctor's number listed on the forms and indicated it was "an answering machine not a doctor's office." (A.R. 412) They further noted that a copy of the form had been requested from the doctor's office, and if nothing was received from the doctor, they would "need to do a fact finding for falsification." (*Id.*)

On December 18, 2007, Vanderpool was seen at the Bakersfield Family Medical Center's Urgent Care Center, asking to see his

6 - FINDINGS & RECOMMENDATION

doctor.   When he was told no doctors were at the clinic that day, Vanderpool "got agitated and stated that he was going to harm some employees at the Mojave Post Office where he has worked for 17 yrs." (A.R. 280)   Vanderpool stated he had had problems at the Post Office for several years, and had resigned, but then was forced to return to work.   He stated "this situation" had caused him and his wife to separate twice.   Vanderpool was "not able to focus long enough to benefit from interventions on safe methods of coping.   He present[ed] agitated, anxious and crying."   (*Id.*) Vanderpool stated he was going to "return to Mojave Post Office and wait outside and then cut the[] throats" of two named employees. (Id.) He stated the two had caused his separation from his wife, stating "this time we won't be getting back together."   (*Id.*)   He was scheduled to work at the Post Office that night.

    The nurse talked with Vanderpool's wife, who confirmed that he was being harassed at work.   She stated their car had been vandalized, and Vanderpool had been "threatened by some co-workers who are in gangs." *Id.*   She stated Vanderpool was under stress at work, and she believed he would harm his coworkers.   The nurse also talked with Vanderpool's supervisor at the Post Office, who reported additional stressors including the serious illness of Vanderpool's father two years earlier, and Vanderpool's worries about his two teenaged children due to his marital separation. Vanderpool was told about community support resources and some coping methods, but he was "distracted and not very open to interventions." *Id.*   He was taken to a hospital for psychiatric evaluation, with no change in his stated plans to harm his coworkers.   (A.R. 281; *see* A.R. 302)

7 - FINDINGS & RECOMMENDATION

Vanderpool's Crisis Stabilization Unit Intake form indicates he was taking Lexapro, Xanax, Paxil, and Risperdal.  (A.R. 282) Vanderpool was noted to be "very agitated, angry - firmly stated he was going to stand outside the Post Office and cut their throats, gave names of two people."  (A.R. 284)  His presumptive diagnosis upon admission was Depressive Disorder not otherwise specified. (A.R. 279, 285)  Dr. Manohara later examined Vanderpool and listed his Axis I diagnosis upon admission as "Major depressive disorder, recurrent, severe with psychosis."  (A.R. 350)  The assessing nurse estimated Vanderpool's current GAF at 30; however, Dr. Manohara estimated his GAF upon admission at 10, and upon discharge at 40.[2] (A.R. 350)  Vanderpool's grooming, motor activity, and speech were "normal," and he was cooperative during his interview.  (A.R. 290) His orientation and concentration were within normal limits.  His intelligence was assessed as "average," but he was noted to be forgetful  (A.R. 291)

---

[2]"The GAF scale is used to report a clinician's judgment of the patient's overall level of functioning on a scale of 1 to 100." *Raegen ex rel. Syzonenko v. Astrue*, slip op., No. 10-CV-401-BR, 2011 WL 1756131 at *5 n.3 (D. Or. May 9, 2011) (Brown, J.).
    "A GAF score of 10-20 indicates 'some danger of hurting self or others . . . OR occasionally fails to maintain minimal personal hygiene . . . OR gross impairment in communication." *Villalobos v. Astrue*, slip op., 2010 WL 5789001 at *9 n.4 (D. Or. Nov. 22, 2010) (Clarke, MJ) (quoting *Diagnostic and Statistical Manual of Mental Disorders IV* ("DSM-IV") at 34 (4th ed. 2000)).
    "A GAF score of 20-30 indicates behavior 'considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas." *Slover v. Comm'r, Soc. Sec. Admin.*, slip op., 2011 WL 1299615, at *9 n.9 (D. Or. Apr. 4, 2011) (Hernandez, J.) (quoting DSM-IV at 34).
    "A GAF of forty indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 n.3 (9th Cir. 2005) (citing DSM-IV at 34).

8 - FINDINGS & RECOMMENDATION

Vanderpool's Axis I discharge diagnosis was "Major depressive disorder, recurrent, severe with psychosis." (A.R. 350)  He was discharged after "contract[ing] for safety," and agreeing to continue taking his medications and follow up with Dr. Manohara for treatment.  (A.R. 352)

On December 19, 2008, a memorandum was circulated to supervisors at Vanderpool's Post Office location indicating, "Under no circumstances should this employee be permitted back on the property without clearance through the medical unit and input from labor relations.  If he does show up, call 911." (A.R. 420)  The memo further indicated that when Vanderpool wanted to return to work, they planned to serve him with an emergency suspension letter.  (*Id.*)  A letter was issued to Vanderpool dated December 19, 2008, informing him that his absence, at the present time, was considered a "medical" absence.  He was directed not to return to his job "or any Post Office until further notice," and directing him to "stay off of Postal property until further notice." (A.R. 421)  Postal investigation notes indicate Vanderpool would not be allowed to return to work until his alleged threat to harm coworkers had been investigated.[3]  (A.R. 428)  In addition, supervisors advised the two threatened employees "to obtain restraining orders through the court against Vanderpool[.]" (A.R. 432)

---

[3]Further notes indicate Vanderpool was interested in disability retirement, and from his later statements to his doctors, it appears he did, in fact, retire from the Postal Service on some type of disability.

9 - FINDINGS & RECOMMENDATION

On March 19, 2008, Dr. Manohara competed a Medical Source Statement form on which he opined Vanderpool would have a fair ability to understand, remember, and carry out simple and complex instructions, and to maintain concentration, attention, and persistence. He opined Vanderpool would have a poor ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to respond appropriately to changes in a work setting. (A.R. 293)

On March 26, 2008, Vanderpool saw Physical Medicine and Rehabilitation specialist Fariba Vesali, M.D. for a comprehensive orthopedic evaluation in connection with his complaints of "[c]lub feet" and "[l]eft hip pain." (A.R. 306-09) Vanderpool stated he was born with club feet and never was treated. He began having foot pain about eight years earlier. He described the pain as "like a toothache that comes and goes." (A.R. 306) The pain was aggravated by cold, and decreased with heat. Cortisone injections had provided only temporary relief. He also complained of right knee pain since age thirteen, when he was diagnosed with Osgood-Schlatter disease.[4] His knee pain also was aggravated by cold, and decreased with heat. He complained of a constant, dull, grinding pain in his left hip that started three to four years earlier. Cold aggravated the pain, and it also was worse "before and after a storm." (Id.) He took medication to decrease the pain. He also

---

[4]"Osgood-Schlatter disease can cause a painful lump below the kneecap in children and adolescents experiencing growth spurts during puberty." Pain, swelling, and tenderness worsen with activity, and pain may last from weeks to months, recurring until growth stops. www.mayoclinic.com/health/osgood-schlatter-disease/ (visited 03/28/2012).

complained of pain in his left ankle since he injured it in high school. Cold and walking aggravated the pain, and elevating his foot decreased the pain. (*Id.*)

Vanderpool stated he could drive a car and do household chores. He spent most of his day sitting at home. He stated he was "on family sick leave from [the] postal services," having been "placed on family leave because he threatened his coworkers." (A.R. 307) He listed his current medications as Lexapro (an antidepressant), Risperdal (an antipsychotic), Xanax (an anti-anxiety medication), Hydrochlorothiazide (a blood pressure medication), and Hydrocodone (a narcotic pain medication). (*Id.*)

On examination, Vanderpool was noted to be 5'9" tall with a weight of 258 pounds. His cervical spinal ranges of motion were lateral flexion of 45 degrees, flexion of 50 degrees, extension of 60 degrees, and rotation of 80 degrees.[5] His lumbar spinal ranges of motion were flexion of 90 degrees, extension of zero degrees, and lateral flexion of 30 degrees,[6] with pain in all directions, and tenderness but "no obvious inflammation." (A.R. 306-07) Hip joint ranges of motion were forward flexion of 100 degrees, backward extension of 30 degrees, interior rotation of 40 degrees,

---

[5]The Oregon Department of Consumer and Business Services, Workers' Compensation Division has adopted norms established by the AMA Guides for spinal ranges of motion. The norms for cervical range of motion are flexion - 60 degrees, extension - 75 degrees, right and left lateral flexion - 45 degrees, right and left rotation - 80 degrees. *See* http://www.cbs.state.or.us/external/ wcd/policy/ bulletins/ab_index.html (visited March 28, 2012), form 2278c, "Spinal (Cervical) Range of Motion."

[6]Oregon's accepted norms for lumbar ranges of motion are lateral flexion - 60 degrees, extension - 25 degrees, right and left lateral flexion of 25 degrees. *Id.*, form 2278l, "Spinal (Lumbar) Range of Motion."

11 - FINDINGS & RECOMMENDATION

exterior rotation of 50 degrees, abduction of 40 degrees, and adduction of 20 degrees bilaterally.[7] (A.R. 308) Knee joint ranges of motion were extension of zero degrees, and flexion of 150 degrees bilaterally[8], with tenderness on the right, but no obvious inflammation of either knee. (*Id.*) Ankle ranges of motion were dorsiflexion of 5 degrees and plantar flexion of 40 degrees bilaterally[9], with "tenderness over soft tissue around the left lateral malleolus," "mild club foot deformity with tenderness over the right fifth metatarsal bone," and "no obvious inflammation over the ankles." *Id.*

Vanderpool's shoulder ranges of motion were forward flexion of 150 degrees, extension of 40 degrees, abduction of 150 degrees, adduction of 30 degrees, internal rotation of 80 degrees, and external rotation of 90 degrees bilaterally.[10] *Id.* His elbow ranges of motion were flexion-extension of 150 degrees, supination

---

[7]Oregon's accepted norms for hip ranges of motion are extension - 30 degrees, flexion - 100 degrees, internal rotation - 40 degrees external rotation - 50 degrees, abduction - 40 degrees, and adduction - 20 degrees. *Id.*, form 4841, "Lower Extremity Range of Motion."

[8]Oregon's accepted norms for knee ranges of motion are extension - 0 degrees, and flexion - 150 degrees. *Id.*

[9]Oregon's accepted norms for ankle ranges of motion are dorsiflexion of 20 degrees, plantar flexion of 40 degrees, eversion of 20 degrees, and inversion of 30 degrees. *Id.*

[10]Oregon's accepted norms for shoulder ranges of motion are extension - 50 degrees, flexion - 180 degrees, adduction - 40-50 degrees, abduction - 170-180 degrees, internal rotation - 80-90 degrees, and external rotation - 60-90 degrees. *Id.*, form 4842, "Shoulder Range of Motion."

12 - FINDINGS & RECOMMENDATION

of 80 degrees, and pronation of 80 degrees bilaterally.[11]    *Id.*
Ranges of motion of his wrist joints were extension and flexion of
60 degrees, radial deviation of 20 degrees, and ulnar deviation of
30 degrees bilaterally.[12]    *Id.*    Finger and thumb joints had
"[n]ormal range of motion."    *Id.*

Vanderpool's motor strength and grip strength were normal, and
he had normal muscle tone in his upper and lower extremities.    He
had "[d]ecreased light touch and pinprick sensation over [the]
lateral aspect of [his] right leg, [but] otherwise light touch and
pinprick [were] intact throughout [his] upper and lower
extremities."    (*Id.*)

Dr. Vesali's diagnoses were "Club feet, foot pain"; "Chronic
left hip pain"; and "Chronic right knee pain with history of Osgood
Schlatter's disease."    (A.R. 309)    Regarding Vanderpool's club
feet, the doctor noted, "There is club foot deformity on both sides
with tenderness over right fifth metatarsal and soft tissue around
the left lateral malleolus.    There is no obvious instability of the
ankles or knees.    No inflammation over ankles or knees."    (*Id.*)    He
opined Vanderpool "should be able to stand and walk for four hours
in an eight-hour day with frequent breaks"; sit for six hours
during the workday; and lift/carry 50 pounds occasionally and 25
pounds frequently.    (*Id.*)    He opined Vanderpool would have no

---

[11]Oregon's accepted norms for elbow ranges of motion are
extension of 0 degrees, flexion of 150 degrees, pronation and
supination of 80 degrees.    *Id.*, form 2279, "Upper Extremity Range
of Motion. . . ."

[12]Oregon's accepted norms for wrist ranges of motion are
dorsiflexion - 60 degrees, palmar flexion - 70 degrees, radial
deviation - 20 degrees, and ulnar deviation - 30 degrees.    *Id.*

13 - FINDINGS & RECOMMENDATION

postural, manipulative, visual, communicative, or "workplace environmental limitations." (*Id.*)

On April 20, 2008, Vanderpool underwent a psychiatric evaluation by psychiatrist Jason H. Yang, M.D., at the request of the state agency. (A.R. 310-13) Dr. Yang had no medical or psychiatric records to review. (A.R. 311) He found Vanderpool to be "a reliable historian." (A.R. 310) Vanderpool stated he had had "nearly eight years of stress and anxiety," with "ongoing pressure from work." (*Id.*) He stated psychiatric medications and group therapy were helping him. He was living alone, and stated he was able to care for himself and his home, go shopping, drive, manage his money, and visit with friends, all without assistance. His affect was "full range and appropriate to mood." (A.R. 312) He completed "mental status examination tasks without any serious difficulty." (A.R. 313) He was diagnosed with "Depressive Disorder, Not Otherwise Specified," and his current GAF was estimated at 65.[13] Dr. Yang opined Vanderpool would have "no limitations in interacting with supervisors, peers and the public"; "mild limitations maintaining concentration and attention, and completing simple tasks"; "mild limitations completing complex tasks and completing a normal workweek without interruption"; and "mild to moderate limitations handling normal stresses at work." (*Id.*)

---

[13]"A GAF of 61-70 indicates some "mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well, has some meaningful interpersonal relationships." *Raegen ex rel. Syzonenko v. Astrue*, slip op., No. 10-CV-401-BR, 2011 WL 1756131 at *5 n.3 (D. Or. May 9, 2011) (Brown, J.) (quoting DSM-IV at 31-34).

14 - FINDINGS & RECOMMENDATION

On May 5, 2008, forensic psychiatrist Calmeze H. Dudley, M.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form (A.R. 317-19), and a Psychiatric Review Technique form (A.R. 320-330, 337). Dr. Dudley indicated Vanderpool has a history of schizophrenia. (A.R. 322) He also indicated Vanderpool has a depressive disorder not otherwise specified. (A.R. 323) The doctor opined these impairments would result in a mild degree of limitation in Vanderpool's activities of daily living, and a moderate degree of limitation in social functioning, and in maintaining concentration, persistence or pace. He indicated there was insufficient evidence to form a conclusion regarding Vanderpool's episodes of decompensation. (A.R. 328) In his review notes, Dr. Dudley noted Vanderpool was improving with his current medications of Lexapro and Risperdal. He noted Vanderpool was "goal directed," and his affect was better. Dr. Dudley therefore considered Dr. Manohara's opinion, but did not adopt it fully. (A.R. 337)

On the residual functional capacity ("RFC") form, Dr. Dudley opined Vanderpool would be moderately limited in his ability to understand, remember, and carry out detailed instructions; complete a normal workday and workweek without interruptions from psycho-logically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (A.R. 317-18) The doctor added the following note: "[Vanderpool] retains the ability to understand, remember, and

15 – FINDINGS & RECOMMENDATION

1   carry out simple work-related tasks and complex task[s] and has no

2   significant limitations in the ability to sustain concentra-

3   tion/persistence/pace, relate to others, or otherwise adapt to the

4   requirements of the normal workplace." (A.R. 319)

5       On May 6, 2008, Geoffrey F. Arabit, a Disability Evaluator

6   Analyst I for the Social Security Administration (*see* A.R. 275),

7   reviewed the record and completed a Physical RFC Assessment form.

8   (A.R. 331-35) In Mr. Arabit's opinion, Vanderpool would be able to

9   lift 50 pounds occasionally and 25 pounds frequently; sit for about

10  six hours in an eight-hour workday; stand/walk about four hours in

11  an eight-hour workday; and push/pull without limitation. He opined

12  Vanderpool could perform all types of manipulative activities on an

13  "unlimited" basis (A.R. 333).

14      On September 12, 2008, Vanderpool saw psychiatrist Timothy A.

15  Mitchell, M.D. in Eugene, Oregon, to establish care "after a move

16  from California in June." (A.R. 362) Vanderpool listed his

17  current symptoms as "down mood, insomnia, high appetite, up & down

18  weight, poor energy, poor memory/concentration, low esteem, mild

19  hopelessness, poor motivation, lowered libido." (*Id.*) The doctor

20  also noted, "In addition, the patient has been experiencing

21  problems with voices that he's always heard, probably since 6th

22  grade. Sometimes he gets unreal feelings and 'odd' thoughts,

23  including fearful, referential thoughts. At times he is not sure

24  what's real." (*Id.*) Vanderpool stated he had been on Lexapro,

25  Risperdal, and Xanax for six years. (*Id.*) Although Vanderpool

26  told Dr. Mitchell he had been hospitalized from December 18, 2007,

27  to January 10, 2008, it does not appear the doctor had those

28  records to review, nor does it appear Vanderpool told him the

16 - FINDINGS & RECOMMENDATION

reason for the hospitalization.   Intake notes indicate Vanderpool
had never been violent or had legal problems.   (*Id.*)   Vanderpool
stated his mother was schizophrenic, and had been "committed to an
institution [and] given ECT [electroconvulsive therapy].   She died
in the institution when [Vanderpool was] 3-4 years old."   (A.R.
363)

      The doctor assessed Vanderpool's speech, affect, thought
process and content, and cognition as "Normal"; his behavior as
"Calm"; his judgment and insight as "Intact"; and his mood as
"euthymic."   (A.R. 364)   His assessment indicates: "Describes
classic Schizoaffective disorder with depression.   He's probably at
baseline and is remaining stable in spite of moving and multiple
changes with that."   (*Id.*)   His Axis I diagnosis was "Schizo-
affective Disorder." (*Id.*)   He continued Vanderpool on his current
medications.   No psychotherapy referral was made because Vanderpool
thought he had adequate support at the time.   (*Id.*)   He was
encouraged to exercise and manage his weight.   (A.R. 365)

      Vanderpool saw Dr. Mitchell for medication management on
October 13, 2008.   He stated he was adjusting to his move, and
dealing with his estranged wife.   His mood was noted to be
"Euthymic to mildly anxious," and his orientation was noted to be
"supportive, problem-solving, insight-oriented, educational."
(A.R. 366)   Vanderpool reported hearing voices the previous week,
and "[h]e spoke with them."   (*Id.*)   He had "[m]ild referential
thinking," and he reported "[v]ague fears when alone.   His Axis I
diagnosis continued to be Schizoaffective Disorder.   (*Id.*)   His
medications were continued without change, but the doctor noted he

17 - FINDINGS & RECOMMENDATION

might consider increasing the Risperdal dosage and adding some individual psychotherapy. (A.R. 367)

On October 21, 2008, internal medicine specialist Sharon B. Eder, M.D. reviewed the record and prepared a "Physical Summary" regarding Vanderpool. She concluded that although Vanderpool's club feet did not meet any Listing, the condition "does create a functional impact." (A.R. 377) She opined Vanderpool could "perform sedentary type work with less than 6 hours standing/ walking." (*Id.*)

On November 5, 2008, psychologist Paul Rethinger, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (A.R. 378-91), and a Mental RFC Assessment form (A.R. 392-95). He indicated Vanderpool has a Schizoaffective disorder "depressed" (A.R. 381), that would cause moderate limitations in his social functioning, and in his ability to maintain concentration, persistence, or pace (A.R. 388). In his notes, Dr. Rethinger noted Vanderpool "is able to perform routine simplified tasks, drive, and handle finances," and he had improved somewhat since his period of decompensation and compliance with treatment. (A.R. 390) He noted Vanderpool's statements about his impairment "were credible at the time they were first made, [but were] no longer applicable." (*Id.*) He noted that although the March 19, 2008, psychiatric work-related functional assessment had indicated Vanderpool would have a poor ability to complete a normal workday without psychiatric inter- ruptions, and a poor response to changes in the workplace, Vanderpool had improved on his medications. Dr. Rethinger concluded Vanderpool's Schizoaffective disorder was not of Listing

18 - FINDINGS & RECOMMENDATION

level severity, "but does impact [his] ability to function in the workplace." (*Id.*)

On the Mental RFC Assessment form, Dr. Rethinger opined Vanderpool would be moderately limited in his ability to understand, remember, and carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (A.R. 392-93) He indicated Vanderpool could "remember and carry out simple instructions within a reasonable amount of time"; "concentrate on non-complex tasks for normal durations (up to 2 hr), and without special supervision in structured work environments"; and "work without distraction when not in close proximity to co-workers or in contact with the general public." (A.R. 394) He also indicated Vanderpool "may benefit from vocational guidance in setting/ attaining goals and adapting to changes." (*Id.*)

On November 5, 2008, Vanderpool saw family practitioner Orlando Conty, M.D. to establish care with him. Vanderpool's primary complaint was "intermittent back and leg pains." (A.R. 399) Vanderpool stated the pain was worse when he was walking, and mainly presented on his left lower back and leg. He stated he could "walk one block before he had to sit down and rest due to the pain." (*Id.*) He also complained of "skin lesions all over his body that look like pimples." (*Id.*) The doctor noted Vanderpool was limping somewhat, and Vanderpool noted he had been referred to a local podiatrist for ongoing treatment of his foot deformities.

19 - FINDINGS & RECOMMENDATION

On examination, Vanderpool exhibited "[d]ecreased peripheral pulses on the left lower extremity," and "[p]ositive mild tenderness to palpation over the lumbosacral spine and paraspinous muscles." (*Id.*) Straight-leg-raising was negative. The doctor referred Vanderpool "for AVI studies of the lower extremities to evaluate arterial circulation." (*Id.*) He also recommended x-rays of Vanderpool's lumbar spine. Current medications were continued, and he also prescribed doxycycline for folliculitis. (*Id.*)

On November 6, 2008, x-rays were taken of Vanderpool's lumbar spine. "[S]mall anterior L3, L4 and L5 osteophytes" were seen, as well as "anterior longitudinal ligament calcifications at T12-L1." (A.R. 403) The radiologists' conclusions were "[m]ild lower lumbar and thoracolumbar junction spondylitic changes," and "[m]inimal L5-S1 disc height loss." (*Id.*)

Vanderpool saw Dr. Mitchell again on November 10, 2008. He reported having a bad week in which he had been ill, and he also had found out his application for Social Security benefits had been denied. He blamed the Post Office and specific employees there "for ruining his life and family," and he stated both he and his son had been "essentially black listed" from ever getting a government job. He claimed the Post Office "won't let him on their property and that he can't get a government job due to what happened." (A.R. 369) He was living with a girlfriend ("who has mood disorder") and a cat "in close quarters in an RV." (*Id.*) He was still hearing some voices and talking to himself, and he had "[m]ild referential to paranoid thinking" and unspecified vague fears. He occasionally had insomnia "for no clear reason," and he had a recurring nightmare. (*Id.*) His Axis I diagnosis continued

20 - FINDINGS & RECOMMENDATION

to be Schizoaffective Disorder.  (*Id.*)  The doctor raised Vander-
pool's Risperdal dosage.  He suggested individual therapy, but
Vanderpool was "[n]ot interested in Counselor due to time and money
and reluctance."  (*Id.*)  The doctor later noted, in the same
record, that Vanderpool had declined counseling "due to overall
anxiety and to finances." (A.R. 370)

On December 4, 2008, Vanderpool saw Dr. Conty with complaints
of pain in his low back, mid-back, and neck.  On examination,
Vanderpool exhibited "tenderness to palpation over the thoracic and
lumbar paraspinous muscles bilaterally," and also over the
trapezius muscles.  (A.R. 398)  The doctor ordered an MRI of
Vanderpool's lumbar spine, and x-rays of his cervical and thoracic
spine.  (*Id.*)

X-rays of Vanderpool's cervical spine were done on December 8,
2008.  The films showed "[m]inimal C6-7 disc height loss," and
"[t]iny bilateral C4-5 and C5-6 uncinate process osteophytes
causing no significant neural foraminal narrowing."  (A.R. 401)

Vanderpool saw Dr. Mitchell on December 8, 2008, for followup.
He was short of breath, "due to likely bronchitis flair [sic]."
(A.R. 464)  He was smoking about half a pack of cigarettes a day.
Vanderpool stated he had seen a podiatrist "who indicated there was
nothing [that] could be done."  (*Id.*)  He was spending most of his
time at home, watching television with his girlfriend.  He visited
his father two to three times a week.  He stated the "[v]oices
[had] gone away" on his increased Risperdal dosage.  (*Id.*)  His
Risperdal was raised again, with the Lexapro and Xanax levels
remaining unchanged, but the doctor noted he "might consider
raising Lexapro if indicated."  (A.R. 465)

21 - FINDINGS & RECOMMENDATION

1    Vanderpool had an MRI of his lumbar spine on December 12,
2  2008.  The images showed disc desiccation at L5-S1, "seen as loss
3  of T2 signal and there is broad-based posterior disc bulge at this
4  level and a mild element of facet arthropathy[,]" but "without
5  focal protrusion."  (A.R. 397)  Intervertebral discs were noted to
6  be "intact at all other lumbar levels and the spinal canal and
7  neural foramina [were] adequate throughout the lumbar spine." (*Id.*)

8    Vanderpool saw Dr. Mitchell on January 12, 2009, for
9  medication management.  He exhibited mild to moderate anxiety, and
10 he was preoccupied with bankruptcy and divorce proceedings, and
11 other general problems.  His medications were continued without
12 change.  (A.R. 462-63)

13   On January 15, 2009, Vanderpool saw Dr. Conty for followup of
14 his low back and leg pain.  Vanderpool had "[n]o new complaints or
15 concerns."  (A.R. 470)  He stated he could not afford to see a
16 physical therapist for his back pain, but thought he might be able
17 to afford physical therapy in three or four months.  He was "doing
18 some exercises to lose weight and also [was] trying to quit
19 smoking."  (*Id.*)

20   On February 9, 2009, Vanderpool saw Dr. Mitchell for
21 medication management and followup.  He described stressors dealing
22 with his estranged wife; his son, who had moved in with him "due to
23 finances and lack of job"; bankruptcy proceedings; and "[t]ax
24 troubles." (A.R. 460)  His girlfriend had started receiving Social
25 Security payments of some kind, so Vanderpool would able to get
26 ninety-day supplies of his medications, which he stated was
27 helpful.  He stated his insurance would only cover ten psychiatric
28 visits per year, which worried him.  He indicated he was only

22 - FINDINGS & RECOMMENDATION

hearing voices now when he was very anxious or upset.  His medications were continued without change.  (A.R. 460-61)

Dr. Mitchell saw Vanderpool on March 9, 2009, for medication management.  He stated he had "bad days," but he had not been unusually down.  He was somewhat anxious related to a recent move. (A.R. 458)  His medications were continued without change. (A.R. 459)

Vanderpool saw Dr. Conty on April 14, 2009, for followup of "multiple medical problems."  (A.R. 469)  He described several recent stressors, and stated he had been "more anxious."  (*Id.*) His medications were helping him.  Examination of his extremities showed "[n]o clubbing, cyanosis or edema."  (*Id.*)

Vanderpool saw Dr. Mitchell for followup on May 4, 2009.  He described several stressors and some problems sleeping.  His medications were continued without change.  (A.R. 456-57)

Vanderpool saw Dr. Conty on June 27, 2009, for food poisoning. He was treated with medications, and lab work was ordered.  There was no mention of his leg or back pain.  (A.R. 468)

On July 6, 2009, Vanderpool saw Dr. Mitchell for followup. His retirement pay from the Post Office had been lowered, his divorce was proceeding slowly, and his blood pressure was not under control.  His girlfriend's three children were with them for the summer, and Vanderpool thought this had boosted his mood somewhat. Vanderpool had been seeing his girlfriend's counselor every few weeks. He occasionally was hearing voices at night, but he did not find this upsetting.  His orientation was viewed as "[s]upportive" and "[p]roblem-solving."  (A.R. 454)  His medications were continued without change.  (A.R. 455)

23 - FINDINGS & RECOMMENDATION

1    Vanderpool saw Dr. Mitchell for followup on October 5, 2009.
2    He stated he could not afford to see a psychotherapist.    His
3    divorce had been finalized, and he was having financial problems.
4    He was hearing voices more often, three to four times weekly.    He
5    had "[p]ersecutory thinking re court and their getting into his
6    business.  Has times when he feels like giving up." (A.R. 452)  He
7    was noted to be negative, downcast, and ruminative, making it hard
8    for the doctor to get clear answers to his questions.  Vanderpool's
9    diagnosis remained schizoaffective disorder.    His Lexapro dosage
10   was increased, with Risperdal and Xanax continued without change.
11   (A.R. 452-53)

12   On December 30, 2009, Dr. Mitchell completed a questionnaire
13   supplied by Vanderpool's attorney.    The doctor stated he had seen
14   Vanderpool for "[m]edication management and supportive
15   psychotherapy" every month or two from September 12, 2008, to
16   December 10, 2009, but as of the latter date, Vanderpool was no
17   longer his patient.  (A.R. 466)  He listed Vanderpool's diagnosis
18   as Schizoaffective Disorder, with symptoms including "Persecutory
19   thinking.    Sometimes hears voices.    Irritability.    Moodiness."
20   (A.R. 477)  Dr. Mitchell opined Vanderpool "would not be able to
21   work well with others." (*Id.*)  When asked if Vanderpool would be
22   able to work full-time at a "simple routine, low stress job, that
23   does not require him to come into contact with the public and does
24   not require him to work in close coordination with supervisors or
25   co-workers," the doctor wrote, with no other explanation, "I doubt
26   he could sustain that level of function." (*Id.*)

27   Dr. Mitchell also completed a form regarding Vanderpool's
28   mental RFC.  He opined Vanderpool would have moderate-to-marked

24 - FINDINGS & RECOMMENDATION

limitation in his ability to understand, remember, and carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and travel in unfamiliar places or use public transportation.  (A.R. 480-82)  He opined Vanderpool would be moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; carry out very short and simple instructions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and set realistic goals or make plans independently of others.  (*Id.*) Dr. Mitchell estimated Vanderpool's limitations had been present since July 2008.  (A.R. 482)

On March 8, 2010, Vanderpool saw psychiatrist William Mark Dean, M.D., to establish care as a new patient.  Vanderpool listed his current problems as "disability, hear voices, talk to self, repeat over and over, have anger issues, continued maintenance, new insurance, depression major." (A.R. 556)  The record only includes the intake form completed by Vanderpool; no treatment notes are included.

On March 22, 2010, Vanderpool saw family medicine specialist Harold Perez-Gil, M.D. to establish care as a new patient.  His hypertension was well controlled on current medications.  His schizophrenia was noted to be "currently stable." (A.R. 488)  Lab tests were ordered to screen for dyslipidemia and diabetes. (*Id.*)

On March 29, 2010, Vanderpool saw Dr. Perez-Gil for follow-up of test results.  Vanderpool was diagnosed with Type 2 diabetes

25 – FINDINGS & RECOMMENDATION

mellitus.   He was started on Metformin and an ACE inhibitor, and was scheduled to see a diabetes educator.  (A.R. 484-85)

On May 6, 2010, Vanderpool was admitted to the hospital for surgical drainage of an abscess on his back.  He was discharged on May 11, 2010, in medically-stable condition.  (A.R. 498-518)

### B.  Vocational Expert's Testimony

The VE described Vanderpool's past work at the Post Office as "a Mail Handler," which is a light, semi-skilled job with an SVP of 4.[14]  As Vanderpool described the job, "he performed it at the heavy level."  (A.R. 37)

The ALJ asked the VE to consider someone who can lift and carry 50 pounds occasionally and 25 pounds frequently; stand/walk and sit for six hours, each, in an eight-hour day; and do simple, one-to-two-step tasks.  The VE stated this individual would not be able to return to Vanderpool's past work because the Mail Handler position is semi-skilled.  (A.R. 37-38)  However, the individual could perform jobs such as Industrial Cleaner ("a custodial position"), which is medium, unskilled, SVP2; Grounds Keeper, which is medium, unskilled, SVP2; and Cleaner II, which is a medium,

---

[14]"SVP" refers to the level of "specific vocational prepara-tion" required to perform certain jobs, according to the *Dictionary of Occupational Titles*.  The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

26 - FINDINGS & RECOMMENDATION

unskilled, SVP 1. (A.R. 38) The individual still would be able to perform those jobs if he could only have occasional contact with coworkers and the general public. (*Id.*)

If the same individual were able to stand for only two hours in an eight-hour day, and also required the ability to change positions from sitting to standing as needed, then all of the jobs the VE identified would be precluded. However, there would be other "sit/stand sedentary jobs" the individual could perform. (A.R. 39) If the individual were "argumentative in the face of criticism by supervisors," the VE indicated he probably could "get away with it once or twice, but if it's ongoing, they wouldn't be able to keep the job." (A.R. 39-40) If the individual would "miss work at a frequency of about, approximately three times per month," then he would be unable to perform any job in the national economy. (A.R. 39)

### C. Vanderpool's Testimony

#### 1. ALJ's problem hearing Vanderpool

At the outset of the hearing, as soon as Vanderpool said, "Good morning, sir," the ALJ told him, "Mr. Vanderpool, we're going to have a problem. . . . If you don't speak loud enough, I won't be able to hear you. If I can't hear you, the prior decision will stand." (A.R. 29) Vanderpool responded, "Okay, sir," and "Yes, sir," but the ALJ still could not hear him well. The following colloquy took place between the ALJ and Vanderpool:

> ALJ: If I can't hear you, you won't convince me. And if you continue talking like that, then we're wasting our time. I'm going to beg that please don't make me waste my time. And speak as loud as you can because this morning

1    you're going to be miked.  I won't be able to
2    make a decision, a different decision than the
     denial because you won't be able to convince
3    me.  I can't hear you.

4    CLMT:  I'm sorry, sir.

5    ALJ:   You understand that?   No, don't be
     sorry.  Just do what you have to do.  You're
6    going to be sorry if you get a denial.  That's
     when you're going to be sorry.

7    CLMT:  Okay, sir.

8    ALJ:  Now, if you don't speak loud enough, and
     this is the last time I'm going to tell you,
9    you know.  We're adults.  I'm not a baby-
     sitter, and I'm telling you what you have to
10   do.  If you don't want to do it, fine, you'll
     pay a price.  It's very easy to speak loud.
11   It's very easy.  That's what I'm doing right
     now.  It's very easy.  You know, it's not
12   rocket science.  You don't want to do it,
     fine.  Mr. Manning [Vanderpool's attorney],
13   having  said  that,  take  your  chances.   Go
     ahead.

14

15   (A.R. 30)

16       Nothing more was said about Vanderpool's speaking volume until

17   the  close  of  the  hearing,  when  the  ALJ  stated,  "Okay,  before

18   closing, I have to say I didn't understand a word, I didn't hear a

19   word he said, not a word, okay?  So that should tell you something.

20   Hearing  closed."   (A.R.  40)   Vanderpool's  attorney  responded,

21   "Okay," and the following exchange took place:

22   ALJ:  I told him many times.  I stressed that,
     in and out.  I don't like giving a hard time
23   to anyone, but you know, if I can't hear what
     a claimant is saying, then how in the world am
24   I going to change a previous decision?  I
     don't know what he said.  I couldn't hear what
25   he said.  Mr. Manning, you know, I hold you
     accountable for that also because, I mean you
26   should know better.  You guys present your
     cases  very  well,  all  three  of  you  [in
27   Manning's law firm] . . . do an excellent job,
     but you also have to remind your claimants
28   that the judge has to hear you in order to

28 - FINDINGS & RECOMMENDATION

have a chance. I mean, this man simply
whispered his way all the way through the
hearing. And I think I was emphatic enough to
let him know that he had to speak up. But,
hey, in and out.

CLMT: I did speak up, Your Honor.

ALJ: Do not apologize. I mean, it's not a
matter of apologizing. It was a matter of
doing it the right way. If you think he's
doing it the right way, well let's see what
happens. If I can't hear what you said in
that tape, and I should be able to hear it now
at the hearing, I'm going to go through the
extra step of listening to the tape. If I
can't figure out what you said, I'm sorry, but
I think we're looking at the Appeals Council.
Anyway, that's all. Thank you.

(A.R. 40-41)

At the end of his written decision, the ALJ noted:

IT IS TO BE NOTED THAT IN COMING TO THE
FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF
LAW, the undersigned was not at all assisted
by the claimant's testimony at the hearing.
He consistently neglected to speak up to the
questions posed, in spite of having been
warned by the undersigned. Relevant state-
ments testified to by the claimant at the
hearing, IF ANY, were thus not communicated to
the undersigned, to the claimant's detriment.
Claimants that repeatedly neglect to speak up
at their hearings are simply doing a dis-
service to the[ir] own cause.

(A.R. 20)

Despite the ALJ's apparent problem hearing Vanderpool, the

transcriptionist apparently was able to hear him, and a transcript

of his testimony was prepared. (*See* A.R. 30-36) It is apparent

from the ALJ's written decision that he did, in fact, consider

Vanderpool's hearing testimony, because he described the testimony

in his credibility analysis. (*See* A.R. 18) As a result, it is not

clear why he included the above-quoted statement in his written

decision.

29 - FINDINGS & RECOMMENDATION

*2.    Vanderpool's hearing testimony*

Vanderpool stated he last worked on December 18, 2007, for the U.S. Postal Service.   The job ended when he "went into a mental hospital because [he] threatened to harm some people, and was going to act on it, and tried to hurt [himself]."  (A.R. 31)  He spent twenty-one days in the hospital.   When he was released, he told "the postal inspectors . . . that [he] could no longer work for the Postal Service, because [he] would either harm somebody or harm [him]self."   (*Id.*)   He retired from the Postal Service "[o]n disability status," and receives 40 percent of his retirement, based on the highest three years of his base pay.  (*Id.*)

Vanderpool had been seeing Dr. Timothy Mitchell and was going to see a counselor, but he had not set up counseling as yet.   He recently had changed insurance, and now would be able to go to South Lane Mental Health.   He was in the process of getting approval for counseling through his insurer.  (A.R. 32)   He was taking Lexapro, Xanax, and Risperdal, and he stated the medications help him sleep.  (*Id.*)

Vanderpool stated he gets along well with other people as long as the situation is calm.   If someone is aggressive toward him, or he has "to work under them," he loses his temper "real bad."  (A.R. 33)   His blood pressure will go up and he will get angry, doing things and saying things he "shouldn't do."   (*Id.*)   He does not handle stress well; he develops anxiety, sometimes even vomiting from stress and anxiety.   (*Id.*)

With regard to social activities, Vanderpool stated he sometimes sees his family "for dinner or something," but otherwise, he and his girlfriend "stay in our room most of the day and either

30 - FINDINGS & RECOMMENDATION

watch TV, or sit there and go through paperwork." (*Id.*) He does not like large crowds and avoids places like Walmart, "where there's large crowds of people." (*Id.*) He stated, "My anxiety goes up real bad, and I have to get out of there within a few minutes or I start getting mad and angry, can't do it." (*Id.*) He is able to go into "a smaller store that's not got very many people in it," and do some shopping for "a half hour or so." (*Id.*)

From a physical standpoint, Vanderpool stated his "back hurts all the time," and he has "a disc problem in [his] lower back." (A.R. 34) He also has problems with his feet. He can only stand for fifteen to twenty minutes at a time before he develops pain in his "sciatic nerve or whatever back there." (*Id.*) He estimated had can lift about fifteen pounds, but cannot hold the weight for very long. He "can carry a gallon of milk into the house, or a gallon of water, or grocery bags, but nothing really [heavy]." (*Id.*)

He can sit for only about an hour at a time before his feet start to go numb.  If that happens, he has to "lay down and stretch, or move around, or try to change angles, and the way I'm sitting . . ., like maybe partially lay down with, turn to the one hip, or go to the other hip." (A.R. 35) He lies down for about an hour a day. (*Id.*)

If Vanderpool does not take his medications, or is late taking them, he hears voices.  If he takes his medications, the voices are "not real loud . . . kind of, you know, in the background, faint." (*Id.*) He stated he has about three days a month when he just stays in bed and stares at the wall due to depression and anxiety. (*Id.*)

31 - FINDINGS & RECOMMENDATION

1    Vanderpool's attorney noted that Vanderpool had worked at the

2   Post Office successfully for almost twenty years, and he asked what

3   had  changed  such  that  Vanderpool  no  longer  is  able  to  work.

4   Vanderpool responded:

5              I can't take orders from people.  I
          can't, I'm not able to communicate with other
6         employees anymore. . . .  I just couldn't take
          it  anymore,  I  guess.   I  don't  know  what
7         exactly  answer  you're  looking  for.   I  just
          couldn't  stand  talking  to  anybody  at  work.   I
8         hated  everybody  there.   My  whole  life  had
          just,  you  know,  father  tried  to  die,  every-
9         thing  just  kind  of  exploded.   Too  much  at  one
          time,  I  guess.   I  locked  myself  in  the  house
10        for  about  four  to  five  days,  and  just  plotting
          and  trying  to  do  a  couple  of  my  fellow
11        employees  in.   I  kind  of  blamed  them  for  the
          problems,  you  know,  that  I've  had. . . .

12

13   (A.R. 36)

14

15   **_3.    Vanderpool's written testimony_**

16      On March 19, 2008, Vanderpool completed a Function Report-

17   Adult.  (A.R. 137-44)  He indicated he spends his days sleeping and

18   watching television.  (A.R. 137)  He described problems sleeping,

19   stating he sometimes is "up for two or three night and day in a row

20   with no sleep."  (A.R. 138)  He prepares food or meals "a couple

21   time[s] a week," and this takes him twenty minutes.  (A.R. 139)  He

22   used to cook more, but now he is not hungry due to depression, and

23   he eats a lot of sandwiches.  He does his own laundry, which takes

24   about an hour, but his roommate does all other household chores.

25   (_Id._)  When Vanderpool goes out, he usually walks.  He sometimes

26   does not leave the house due to depression.  He shops for food

27   "once a week" for about thirty minutes.  He can pay his own bills

28   and handle his own money.  (A.R. 140)

32 - FINDINGS & RECOMMENDATION

Vanderpool indicated he has no hobbies or interests.  He used to be an "outgoing person with life," but now has no friends and is "depress[ed] all the time."  (A.R. 141)  He attends group therapy three days a week at Good Samaritan Hospital.  He sometimes visits his sister, which he can do without anyone accompanying him.  (*Id.*)  He has problems getting along with his stepmother, who Vanderpool indicated "is trying to control me and cause me to become angry all the time."  (A.R. 142)  He stated most of his friends had stopped talking to him because of his anger, so he talks to himself all the time.  (*Id.*)

Vanderpool indicated he cannot lift more than twenty pounds at a time without hurting his "feet and back."  (*Id.*)  He can walk about half a mile before he has to rest.  He estimated he can pay attention for about thirty minutes, and he does not usually finish what he starts, such as conversations, reading, or watching a movie.  He does not follow written instructions well "at all," stating, "I am the boss."  (*Id.*)  However, he has followed spoken instructions well at times.  (*Id.*)  He stated he had been "fired or laid off" from the Post Office due to problems getting along with people, stating, "I told my boss that I would kill him or her and . . . meant it."  (A.R. 143)  He does not handle stress or changes in routine well.  He believes the police are following him all the time.  (*Id.*)  He does not have an e-mail address because he "hate[s] machines."  (A.R. 144)

Vanderpool also completed a Pain Questionnaire.  (A.R. 155-57)  He indicated he has pain in his feet, knees, and back that started in 1972.  The pain feels "like a toothache."  (A.R. 155)  The pain does not spread, staying in the "same four or five places,"

33 - FINDINGS & RECOMMENDATION

1 identified as his right hand, upper and lower back, right knee, and
2 neck. He has the pain about twice a week. It is brought on by
3 weather, physical exertion "of the wrong kind, missing a step or
4 stepping too quickly." (*Id.*) Sometime the pain lasts for days,
5 while other times it resolves within an hour with rest. He takes
6 Tylenol and gets cortisone shots as needed for the pain, with no
7 side effects. (A.R. 155-56) "Hot baths help when available."
8 (A.R. 156) He sometimes wears an ankle brace or wrap for support.
9 (*Id.*) Vanderpool indicated that due to his pain, he can no longer
10 get through a full eight-hour day of work, especially during the
11 winter. The pain first began affecting his activities in 1972, "as
12 a child. Has club feet." (*Id.*) He stated if he is walking, he
13 has to stop about every half hour or "half a mile" to rest. (A.R.
14 157) He can stand for thirty minutes, and sit for thirty to forty
15 minutes, at a time. He drives his own car, and is able to do light
16 housekeeping chores without assistance. (*Id.*)

17

18                          **D.  *Third-Party Testimony***

19     Vanderpool's sister, Diane Vanhorn, completed a third-party
20 function report on March 20, 2008. (A.R. 147-54) She stated she
21 spends "quite a bit" of time with her brother, who lives with a
22 roommate in an RV park. Regarding Vanderpool's daily activities,
23 Vanhorn stated he "drinks coffee[,] takes a shower[,] goes to
24 therapy 3x a week[,] watches a lot of TV[,] eats and lays around
25 the house." (A.R. 147) She stated he sometimes sleeps well for
26 two or three days, and then might spend two or three days "with
27 hardly any sleep at all." (A.R. 148) She noted that although
28 Vanderpool "bathes daily, he really doesn't seem to care how he

34 - FINDINGS & RECOMMENDATION

dresses or looks, where before he always did." (*Id.*) According to Vanhorn, her brother sometimes needs reminders to take his medications.   He eats "mostly sandwiches, deli foods and fast food," if left on his own, but he eats at her house about three times a week.   She stated Vanderpool used to love to "cook and BBQ [but] now he doesn't. . . .   He just is so depressed all the time and is not motivated to do anything."   (A.R. 149)

Vanhorn stated her brother's roommate does most of the housework, but Vanderpool does his own laundry about twice a week. He sometimes needs a "reminder that the clothes a[re] piling up." (*Id.*)   According to her, Vanderpool leaves the house about twice a day, either walking or driving car.   He drives and can go out alone.   He shops for food and clothing a couple of times a week, for about an hour.   He pays his own bills and handles his own money.   She stated Vanderpool used to enjoy playing cards and board games, and going camping, but now he spends most of his time watching TV.   (A.R. 150-51)   He stays at her house three days week so he can attend group therapy sessions at the hospital, "and he talks to his kids on the phone every day."   (A.R. 151)   She stated Vanderpool has forgotten to go to doctor appointments a couple of times.   (*Id.*)   According to her, Vanderpool "thinks everyone is against him and in [her] opinion he is delusional."   (A.R. 152)   He used to enjoy getting together with people to BBQ and play cards, but "now all he wants to do is sit in front of the TV."   (*Id.*)

In Vanhorn's opinion, Vanderpool has problems with lifting, bending, standing, memory, and concentration.   Standing for 20 minutes "hurts him."   (*Id.*)   His memory is "pretty good but medicine clouds his thoughts (concentration - about 20-30

35 - FINDINGS & RECOMMENDATION

minutes)." (*Id.*)  She estimated Vanderpool can walk two or three blocks before having to rest for five to ten minutes, and he can pay attention for about twenty minutes.  He does not follow written instructions well because he hurries too much, but he follows spoken instructions "very well." (*Id.*)  He does not get along with authority figures well, and has threatened his coworkers and boss. (A.R. 152-53)  He does not handle changes in routine well, and "need[s] structure at all times." (A.R. 153)  She stated he needs crutches and leg braces "when his legs hurt or his feet[;] however[,] he doesn't [use them] as often as he should." (*Id.*)

Vanhorn concluded with the following:

> [Vanderpool] has always had some problems but over the last few years, he has progressively gotten worse.  It has gotten to the point where he threatens people with bodily harm. The medicine helps as does group therapy.  The medicine he takes helps keep him calm but causes other problems, like concentration [and] weight gain.  At times he still seems to be in his own little world.  He still talkes [sic] to himself a lot and not realize he's doing it.

(A.R. 154)

### III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.  Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the

meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regula-tions?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner

37 - FINDINGS & RECOMMENDATION

fails meet this burden, then the claimant is disabled, but if the
Commissioner proves the claimant is able to perform other work
which exists in the national economy, then the claimant is not
disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
§§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony
and also resolves any conflicts in the evidence. *Batson v. Comm'r
of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing
*Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).
Ordinarily, the ALJ must give greater weight to the opinions of
treating physicians, but the ALJ may disregard treating physicians'
opinions where they are "conclusory, brief, and unsupported by the
record as a whole, . . . or by objective medical findings." *Id.*
(citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
(9th Cir. 2001)). If the ALJ disregards a treating physician's
opinions, "'the ALJ must give specific, legitimate reasons'" for
doing so. *Id.* (quoting *Matney*).

The law regarding the weight to be given to the opinions of
treating physicians is well established. "The opinions of treating
physicians are given greater weight than those of examining but
non-treating physicians or physicians who only review the record."
*Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir.
2003). The *Benton* court quoted with approval from *Lester v.
Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as
follows:

> As a general rule, more weight
> should be given to the opinion of a
> treating source than to the opinion
> of doctors who do not treat the
> claimant. At least where the

38 - FINDINGS & RECOMMENDATION

> treating doctor's opinion is not
> contradicted by another doctor, it
> may be rejected only for "clear and
> convincing" reasons.  We have also
> held that "clear and convincing"
> reasons are required to reject the
> treating doctor's ultimate conclu-
> sions.  Even if the treating
> doctor's opinion is contradicted by
> another doctor, the Commissioner may
> not reject this opinion without
> providing "specific and legitimate
> reasons" supported by substantial
> evidence in the record for so doing.

*Id.* (quoting *Lester, supra*).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's
> subjective symptom testimony, the ALJ must
> engage in a two-step analysis.  *Smolen v.
> Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
> Under the first step prescribed by *Smolen*,
> . . . the claimant must produce objective
> medical evidence of underlying "impairment,"
> and must show that the impairment, or a combi-
> nation of impairments, "could reasonably be
> expected to produce pain or other symptoms."
> *Id.* at 1281-82.  If this . . . test is satis-
> fied, and if the ALJ's credibility analysis of
> the claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so."  *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

### B.  The ALJ's Decision

The ALJ found Vanderpool has severe impairments consisting of

"chronic low back pain and a major depressive and mood disorder,"

although not at the listing-level of severity, either singly or in

combination.  (A.R. 14)  In evaluating Vanderpool's mental impair-

ments, the ALJ found his impairments do not meet the criteria of

39 - FINDINGS & RECOMMENDATION

"paragraph B" of the adult mental disorders listings. (A.R. 16-17; *see* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A), describing the "paragraph B" and "paragraph C" criteria)  He similarly found the record evidence does not establish the presence of the "paragraph C" criteria.  (A.R. 17)

The ALJ found Vanderpool has mild restriction in his activities of daily living, noting he consistently has reported that he "independently does his own bathing, dressing, cooking, and household chores[.]"  (A.R. 16; citation omitted)  The ALJ found he has moderate difficulties in social functioning, and with regard to concentration, persistence, or pace.  (*Id.*)

The ALJ found Vanderpool has the following residual functional capacity:

> [T]o perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c).  Medium work is defined as the ability to lift no more than 50 pounds at a time; frequently lift and/or carry up to 25 pounds; stand and/or walk approximately 6 hours of an 8 hour workday, able to use hands and arms for grasping, holding, and turning objects, however he would be precluded from climbing ropes, ladders, or scaffolding. In consideration of [his] mental impairment he would be limited to work that involves only simple 1 or 2 step tasks and only occasional contact with co-workers and the general public. [Footnote omitted.]

(A.R. 17)

The ALJ found Vanderpool's description of the intensity, persistence, and limiting effects of his symptoms "not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (A.R. 19)  He found Vanderpool can perform less than the full range of medium-level work.  Based on the VE's testimony in response to the ALJ's hypothetical questioning, the

40 - FINDINGS & RECOMMENDATION

1  ALJ concluded Vanderpool can "perform the requirements of medium
2  entry level unskilled work (SVP-2) with representative occupations
3  such as an industrial cleaner/custodian . . .; a grounds keeper
4  . . .; or . . . a cleaner II. . . ." (A.R. 19-20)  He therefore
5  concluded Vanderpool is not disabled. (A.R. 20)
6  23
7
8              *IV.  STANDARD OF REVIEW*
9      The court may set aside a denial of benefits only if the
10 Commissioner's findings are "'not supported by substantial evidence
11 or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
12 *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
13 *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
14 *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
15 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
16 mere scintilla but less than a preponderance; it is such relevant
17 evidence as a reasonable mind might accept as adequate to support
18 a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
19 1039 (9th Cir. 1995)).
20     The court "cannot affirm the Commissioner's decision 'simply
21 by isolating a specific quantum of supporting evidence.'"  *Holohan*
22 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
23 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
24 must consider the entire record, weighing both the evidence that
25 supports the Commissioner's conclusions, and the evidence that
26 detracts from those conclusions.  *Id.*  However, if the evidence as
27 a whole can support more than one rational interpretation, the
28 ALJ's decision must be upheld; the court may not substitute its

41 - FINDINGS & RECOMMENDATION

1  judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
2  *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

3

4                        *V.  DISCUSSION*

5      Vanderpool argues the ALJ erred in failing to address the
6  opinions given by his treating psychiatrists, Drs. Manohara and
7  Mitchell, and the examining physician, Dr. Vesali. Dkt. ##16 & 19.
8  In response, the Commissioner offers conclusions he opines the ALJ
9  would have reached if he had addressed these doctors' opinions,
10  arguing the ALJ assessed the medical evidence properly.

11      The court agrees with Vanderpool that the ALJ failed to
12  address the doctors opinions adequately.  The ALJ makes no mention
13  at all of Dr. Manohara or his opinions.  With regard to
14  Dr. Mitchell, the ALJ only notes "he diagnosed [Vanderpool] as
15  having a schizoaffective disorder with persecutory thinking,
16  irritability, moodiness, and occasional auditory hallucinations."
17  (A.R. 16)  The ALJ does not mention or address the opinions of
18  either of these treating sources regarding how Vanderpool's mental
19  impairments would affect his work-related functional abilities.
20  Instead, the ALJ "accepts and concurs with the findings" of
21  examining psychiatrist Dr. Yang. (*Id.*)   Where a treating
22  physician's opinion is contradicted by another doctor, the ALJ may
23  only reject the treating doctor's opinion by "providing 'specific
24  and legitimate reasons' supported by substantial evidence in the
25  record." *Lester*, 81 F.3d at 830. Here, the ALJ failed even to
26  acknowledge the opinions of Vanderpool's treating sources, let
27  alone to give "specific and legitimate" reasons for rejecting their
28  opinions.

42 - FINDINGS & RECOMMENDATION

With regard to examining physician Dr. Vesali, the ALJ acknowledged that Dr. Vesali would limit Vanderpool's standing/walking to four hours in an eight-hour workday. (A.R. 15) The Social Security disability evaluator analyst assigned to Vanderpool's case agreed with this assessment. (A.R. 333) However, in the ALJ's hypothetical question, he asked the VE to consider an individual who could stand and walk for *six hours* in an eight-hour day. (A.R. 37) The ALJ included the six-hour limitation in his RFC assessment. (A.R. 17) The only medical source who opined Vanderpool could stand and walk for six hours a day was Dr. Eder, a doctor who did a paper review of the record and prepared a one-page "Physical Summary." (A.R. 377) As in the case of a treating source, the ALJ may only reject the contradicted opinion of an examining source "'by providing specific and legitimate reasons that are supported by substantial evidence.'" *Rayn v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting *Lester*, 81 F.3d at 830). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (citing *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)).

In the case of Drs. Manohara, Vesali, and Mitchell, the Commissioner sets forth an analysis of their opinions that the ALJ *might* have made, but that is not the proper standard of review. Dkt. #19. This, essentially, asks the court to do the ALJ's analysis where it does not exist. The court may not make its own independent findings, and is "constrained to review the reasons the

43 - FINDINGS & RECOMMENDATION

ALJ asserts." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (citations omitted). Here, where the ALJ made very few findings, the court is left with little to review.

Vanderpool also argues the ALJ erred in failing to make any mention of the lay evidence offered by Vanderpool's sister Diane Vanhorn. Again, the Commissioner argues what the effect of this evidence should be, but the court is limited to reviewing the ALJ's reasons, not what the Commissioner argues the ALJ might or should have concluded. *Id.* "Disregard of the testimony of friends and family members violates 20 C.F.R. § 404.1513(e)(2) (1991)." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (citations omitted). Here, the ALJ failed to discuss Vanhorn's opinion at all, making it impossible for the court to review how he treated this evidence.

Vanderpool also argues the ALJ erred in failing to give clear and convincing reasons for rejecting Vanderpool's testimony regarding how he is limited by his impairments. The ALJ summarized Vanderpool's testimony, and found his "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" (A.R. 19) Having so found, the ALJ was required to provide clear and convincing reasons for finding Vanderpool's testimony not to be credible. *See Lester*, 81 F.3d at 834 ("Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'") (quoting *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). Further, those credibility findings "must be 'sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.'" *Pruitt v.*

44 - FINDINGS & RECOMMENDATION

*Astrue*, slip op., 2012 WL 1005108, at *3 (D. Or. Mar. 23, 2012) (Hernandez, J.) (quoting *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995), in turn citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)); *see Lester*, 81 F.3d at 834 ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.") (citing *Doddrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Varney v. Sec'y of Hearth & Human Servs.*, 846 F.2d 581, 584 (9th Cir. 1988)).

In finding Vanderpool's descriptions of his symptoms and their persistence and limiting effects not to be fully credible (*see* A.R. 19), the ALJ did not make any findings or point to any objective evidence contradicting Vanderpool's testimony regarding his physical limitations, nor did the ALJ identify any medical source contradicting Vanderpool's testimony.  The ALJ also failed to identify any affirmative evidence of malingering.  Regarding Vanderpool's mental health symptoms, the ALJ cited only a single instance of "objective evidence" arguably contradicting Vander-pool's testimony; namely, Vanderpool's statement at the hearing that he "hoped to work with a counselor after he resolves issues with his health insurance." (A.R. 18)  The ALJ noted Dr. Mitchell had indicated Vanderpool "had no interest in working with a counselor due to time, money, and reluctance to do so." (*Id.*; citing A.R. 458, 460, 462, & 464)  The ALJ failed to acknowledge Dr. Mitchell's clarifying notation that Vanderpool had declined counseling at that time "due to overall anxiety and to finances." (A.R. 370; *cf.* A.R. 460, 462-63, 470, indicating that during late 2008 and early 2009, Vanderpool was involved in bankruptcy and

45 - FINDINGS & RECOMMENDATION

1   divorce proceedings; "[t]ax troubles"; and his unemployed son had
2   moved in with him).   The court finds no inconsistency between
3   Vanderpool's lack of interest in seeing a counselor due to "time
4   and money and reluctance" in December 2008, shortly after his move
5   from California to Oregon, and his willingness to obtain counseling
6   in January 2010, after he had changed to an insurance that covered
7   counseling visits. (*See* A.R. 32)

8       The ALJ also noted, in his credibility analysis, that
9   Vanderpool "remained soft voiced in his discussion" despite being
10  "repeatedly reminded on the record to speak up in order that the
11  equipment could effectively capture his testimony[.]" (*Id.*)  The
12  court finds Vanderpool's speaking volume to be irrelevant to his
13  credibility.   Moreover, as noted above, the ALJ *did* consider
14  Vanderpool's testimony in reaching his decision, further under-
15  scoring the irrelevance of Vanderpool's speaking volume in
16  considering his credibility.  "'In Social Security cases, the ALJ
17  has a special duty to fully and fairly develop the record **and to**
18  **assure that the claimant's interests are considered**.'"  *Hayes v.*
19  *Astrue*, 270 Fed. Appx. 502, 504 (9th Cir. 2008) (emphasis added;
20  quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (per
21  curiam)).  "This duty exists even when the claimant is represented
22  by counsel." *Id.*  Here, the ALJ's statements suggest either an
23  inability or an unwillingness to perform this function properly.
24  If the ALJ truly was unable to hear or understand Vanderpool, he
25  had a duty to take steps to rectify the situation, either by
26  employing means to amplify Vanderpool's voice further, or to assist
27  himself in hearing.  The improperly supported rejection of parts of
28  Vanderpool's testimony requires a remand for proper analysis by the

46 - FINDINGS & RECOMMENDATION

ALJ.   Whether the medical opinions support or detract from Vanderpool's described symptoms is an analysis not yet done in the proper manner.   Upon remand, the ALJ should analyze and discuss whether the medical evidence of record supports or contradicts Vanderpool's subjective complaints.

In summary, the undersigned finds the ALJ erred in failing to provide a reasoned, supported analysis of the evidence sufficient for a proper review by the court.   Because of these deficiencies, the ALJ's decision fails to justify his finding that Vanderpool is able to work.   The hypothetical question posed to the VE failed to include the limitation that Vanderpool can only stand for four hours a day, and failed to include the limitations set forth by Vanderpool's two treating psychiatrists.   *See Osenbrock v. Apfel*, 240 F.3d 1157, 1163 (9th Cir. 2001) ("An ALJ must propose a hypothetical that is based on medical assumptions supported by substantial evidence in the record that reflects each of the claimant's limitations.")

The remaining question is the proper remedy.   Vanderpool argues the court should remand for an immediate finding of disability and payment of benefits, while the Commissioner requests that if the court finds the ALJ erred, the case be remanded for further administrative proceedings.   In *Lester*, the Ninth Circuit held:

> Where the Commissioner fails to provide ade-
> quate reasons for rejecting the opinion of a
> treating or examining physician, we credit
> that opinion "as a matter of law." *Hammock v.*
> *Bowen*, 879 F.2d 487, 502 (9th Cir. 1989); *see*
> *also Pitzer [v. Sullivan]*, 908 F.2d [502,] 506
> [(9th Cir. 1990)] (remanding for payment of
> benefits where Secretary did not provide
> adequate reasons for disregarding examining

> physician's opinion).  Similarly, where the
> ALJ improperly rejects the claimant's testi-
> mony regarding his limitations, and the
> claimant would be disabled if his testimony
> were credited, "we will not remand solely to
> allow the ALJ to make specific findings
> regarding that testimony." *Varney v. Secre-*
> *tary of Health and Human Services*, 859 F.2d
> 1396, 1401 (9th Cir. 1988). . . . Rather, that
> testimony is also credited as a matter of law.
> *Id.*

*Lester*, 81 F.3d at 834.  The Ninth Circuit "built upon" the rule

announced in *Lester* in *Smolen v. Chater*, 80 F.3d 1273 (9th Cir.

1996), "by positing the following test for determining when evi-

dence should be credited and an immediate award of benefits

directed:

> "(1) the ALJ has failed to provide
> legally sufficient reasons for rejecting such
> evidence, (2) there are no outstanding issues
> that must be resolved before a determination
> of disability can be made, and (3) it is clear
> from the record that the ALJ would be required
> to find the claimant disabled were such evi-
> dence credited."

*Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (quoting

*Smolen*, 80 F.3d at 1292).  The *Harman* court further observed that

the *Smolen* test is really a two-part test "wherein the third prong

is a subcategory of the second: if the ALJ were not 'required to

find the claimant disabled' upon crediting the evidence, then this

certainly would constitute an 'outstanding issue[] that must be

resolved before a determination of disability [could] be made.'"

*Harman*, 211 F.3d at 1178 n.7 (quoting *Smolen*, 80 F.3d at 1292).

Here, the court has found the ALJ failed to provide legally-

sufficient reasons for rejecting the opinions of Drs. Manohara,

Mitchell, and Vesali.  If the *Smolen* test is satisfied with respect

to their opinions, remand for payment of benefits is warranted

48 - FINDINGS & RECOMMENDATION

"regardless of whether the ALJ *might* have articulated a justifi-
cation for rejecting [the doctors'] opinions." *Harman*, 211 F.3d at
1179 (emphasis in original).

On March 19, 2008, just two months after Vanderpool's release
from hospitalization in connection with his mental breakdown,
Dr. Manohara opined Vanderpool would have a poor ability to
complete a normal workday and workweek without interruptions from
psychologically-based symptoms, and to respond appropriately to
changes in a work setting.   (A.R. 293)   Standing alone, this
opinion would carry little weight, given its proximity to
Vanderpool's hospitalization, and the fact that subsequent treat-
ment records reflect dramatic improvement in his symptoms with
medications and therapy.   However, Dr. Mitchell, who treated
Vanderpool for over a year, offered a similar opinion.   In December
2009, Dr. Mitchell opined Vanderpool would have moderate-to-marked
limitation in his ability to understand, remember, and carry out
detailed instructions; complete a normal workday and workweek
without interruptions from psychologically-based symptoms; perform
at a consistent pace without an unreasonable number and length of
rest periods; and travel in unfamiliar places or use public
transportation.   (A.R. 480-82)   This treating psychiatrist's
opinion was made even after the improvements in Vanderpool's
condition after another twenty-one months of treatment.   These
types of limitations were not included in any hypothetical question
posed to the VE, nor was Dr. Vesali's opinion that Vanderpool could
only stand/walk four hours a day.   The ALJ failed to give clear and
convincing reasons for rejecting the opinions of these treating
sources.

1    The VE was asked a question, however, that included a signifi-
2    cant limitation to which Vanderpool testified; i.e., that about
3    three days a month, he just stays in bed and stares at the wall due
4    to depression and anxiety.  When the VE was asked to consider an
5    individual who would "miss work at a frequency of about, approxi-
6    mately three times per month," he testified the individual would be
7    unable to perform any job in the national economy.  (A.R. 39)
8    However, none of Vanderpool's progress notes indicate he ever
9    complained to any of his treating sources that he was unable to get
10   out of bed three times a month.  Without at least some medical
11   evidence corroborating a medical condition as the cause of these
12   anticipated absences, the court stops short of finding that
13   Vanderpool's testimony on this point creates a record on which the
14   ALJ must find Vanderpool disabled.  The ALJ must evaluate this
15   evidence properly on remand, including obtaining an opinion from a
16   VE that is based on an appropriate hypothetical question.

17       The ALJ's opinion that Vanderpool can work was based on the
18   VE's response to a hypothetical question that did not accurately
19   reflect all of Vanderpool's limitations.  "If an ALJ's hypothetical
20   does not reflect all of the claimant's limitations, then 'the
21   [vocational] expert's testimony has no evidentiary value to support
22   a finding that the claimant can perform jobs in the national
23   economy.'"  *Bray v. Comm'r*, 554 F.3d 1219, 1228 (9th Cir. 2009)
24   (quoting *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991));
25   *see Jimerson v. Barnhart*, 51 F. App'x 208, 211 (9th Cir. 2002)
26   (ALJ's denial of benefits based on VE's opinion derived from
27   incomplete hypothetical is not supported by substantial evidence)
28   (citing *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002)).  As

50 - FINDINGS & RECOMMENDATION

a result, there are still issues to be resolved before a final determination of disability can be made. Although the evidence suggests Vanderpool may be disabled, the court cannot reweigh the evidence and substitute its judgment for that of the ALJ. Instead, the case should be remanded with instructions for the ALJ to develop the Record adequately, as needed; to formulate an appropriate hypothetical question for the VE that includes all of Vanderpool's limitations; to give proper consideration to the opinions of Vanderpool's treating sources, and to give specific and legitimate reasons if he rejects those opinions; to perform a proper and complete credibility analysis, identifying what testimony he finds not credible and evidence that undermines Vanderpool's complaints; and to give proper consideration to the third-party statement. I therefore recommend the Commissioner's decision be reversed and the case be remanded for further proceedings consistent with this opinion.

### VI.  CONCLUSION

For the reasons discussed above, the undersigned recommends the Commissioner's decision be **reversed** and the case be **remanded for further proceedings** consistent with this opinion.

### VII.  SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due by **July 2, 2012**. If no objections are filed, then the Findings and Recommendations will go under advisement on that date. If objections are filed, then any response is due by **July 19, 2012**. By the earlier of the response

51 - FINDINGS & RECOMMENDATION

1  due date or the date a response is filed, the Findings and

2  Recommendations will go under advisement.

3       IT IS SO ORDERED.

4                     Dated this 14th day of June, 2012.

5

6

7                        /s/ Dennis James Hubel
                         Dennis James Hubel
8                        Unites States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

52 - FINDINGS & RECOMMENDATION